CARROLL, Judge.
The appellant filed an action under the Mechanics’ Lien Law for enforcement of a lien for the value of engineering services alleged to have been performed by him in connection with certain described land owned by appellees, under contract with appellees. By answer the defendants denied the material allegations of the complaint, and averred that the plaintiff had not performed any services in connection with the property; that improvements on the property were not made; that no contract had been entered into between the parties; that the services alleged to have been performed by plaintiff were of no value; and that defendants were not indebted to plaintiff.
Section 713.03 Fla.Stat., F.S.A. entitled: “Liens for professional services,” in subsection (1) provides that an architect, landscape architect, engineer or land surveyor shall have a lien, on real property improved, for money owed him for his services in preparing plans, specifications or drawings used in connection with improving the real property or for services in supervising any portion of the work of im *356 proving the real property “rendered in accordance with his contract and with the direct contract” — that is, under a contract with the owner, or under a subcontract.
Subsection (2) of § 713.03, on which the plaintiff is proceeding in this case, is applicable where services are performed incident to certain property but where the intended improvement of the property is not made. Thereunder an engineer has a lien for such services (plans, etc.) for the amount due him therefor, notwithstanding the planned improvement is not made, when the services are rendered under a “direct” contract with the owner, as distinguished from a subcontract.[1]
Plaintiff moved for partial summary judgment on liability, and defendants moved for summary judgment. The plaintiffs motion was denied. Defendants’ motion was granted. Summary judgment was entered for the defendants, and the plaintiff appealed.
The evidence before the court at the hearing on the motions for summary judgment included an affidavit of the defendant Jack Pyms, a deposition of Mrs. Pyms, an affidavit and the deposition of the plaintiff engineer, a deposition of the owners’ architect Carson Bennett Wright and the written contract of September 30, 1969, between Pyms and the architect. The contract with the architect, in addition to providing for architectural services and for payment therefor, provided for engineering services and for payment thereof by the owner. In that connection Pyms’ contract with the architect contained the following:
“The working drawings prepared by the architect will be inclusive of all required engineering services, however, all engineering services and drawings required and corresponding fees for such services shall be at the direct expense of the owner, exclusive of the above quoted architectural fee.
“As mentioned before, the owner will be required to pay the direct expenses for all engineering services required for the project, however, it is herein agreed that the engineer so retained shall be at the approval of the architect and will perform under his direction in order to control the design of the project.”
In the judgment rendered the court stated :
“1. Defendant Jack Pyms engaged one Carson Bennett Wright to architecturally design a private residence to be constructed on unimproved real property owned by said defendant and his wife, which real property is the subject matter of this litigation.
“2. Following some preliminary services, Pyms and Wright entered into a Letter Agreement dated September 30, 1969, outlining the nature and extent of the architectural services and making provision for payment to the architect of an aggregate sum of Five Thousand Five Hundred ($5,500.00) Dollars. The Agreement further contained verbiage which made it clear that any engineering services were to be exclusive of the architect’s fee and would be paid by the owner to the engineer. Wright told the plaintiff (the engineer) that the plaintiff would have to do his own negotiating with the defendants with respect to his fee and that under Wright’s agreement with Pyms, he, the architect, was not to be responsible for engineering fees. Plaintiff, however, chose not to contact the owners with respect to his fee and instead began to perform the engineering *357 work without a direct contract or agreement with the owners as to the amount and manner of payment of his fee.
>}c % ‡»
In granting summary judgment for the defendant the trial court proceeded on three grounds. First upon the expressed conclusion of the court that the plaintiff was not entitled to a lien because he did not have a “direct contract” within the meaning of § 713.03(2), stating: “The phrase ‘direct contract’ connotes a face-to-face personal confrontation of the parties, which was wholly lacking in this case.” That holding of the trial court would deny the effectiveness of an owner’s contract with an engineer made by the owner through an agent (which the appellant contends was done here).
Secondly, the court found there was no evidence of authority of the architect “to bind the defendants to pay the plaintiff any sum whatsoever.” That does not appear to be a finding of absence of evidence that the architect had authority to act as agent for the owner to make a contract between the owner and the engineer for services, but appears to be a finding that the architect was without authority to fix any sum as compensation to be paid therefor. As revealed in the deposition testimony of the architect, he did not purport to do the latter.
Third, the court appeared to reject the theory of implied contract between the engineer and the owner, where the court stated (correctly) that “mere knowledge on the part of the owners that the plaintiff was the person doing the work with reference to their property is not in itself sufficient to establish a ‘direct contract’,” but did not comment on other facts shown, bearing on existence of an implied contract.
The initial question presented by this appeal is whether the trial court was correct in holding that in order for there to be a “direct contract” between an owner and an engineer (for services of the latter in connection with a given parcel of real estate), the contract must be one that is made by them in a “face-to-face personal confrontation of the parties,” as distinguished from a contract between them made through an agent, or a contract implied by law (upon facts sufficient therefor).
We find merit in the contention of the appellant that the trial court ruled incorrectly in holding that a “direct” contract between an owner and an engineer could be made only by “a face-to-face personal confrontation of the parties.”
An owner of real estate can become directly obligated to an engineer, for performance by the latter of services relating to his property, by a contract which is made with the engineer by the owner through an agent, as effectively as if the parties made such contract face-to-face. Citation of authority for that proposition appears unnecessary.
The lien statute defines “direct contract” to be “a contract as herein defined between the owner and any other person” [§ 713.-01(4) Fla.Stat., F.S.A.], Contract is defined in the statute as “an agreement for improving real property, written or unwritten, express or implied." [§ 713.01(1)]. Under those definitions it seems clear that a “direct contract” between an owner and an engineer for performance of services by the latter with respect to certain property is an express or implied contract under which the owner becomes obligated to pay the engineer therefor, as distinguished from the situation where the services for which a lien is claimed were performed by the engineer under a subcontract. Nothing in the statutory definition of “direct contract” excludes one made through an agent.
While we have been shown no decisions under the present lien law dealing with the definition of privity or “direct contract” with the owner, under the prior lien law privity of contract between an owner and a lien claimant was held to exist where the *358 owner was expressly or impliedly personally obligated to the claimant. See Harper Lumber & Mfg. Co. v. Teate, 98 Fla. 1055, 125 So. 21, 23, and First Nat. Bank of Tampa v. Southern Lumber & Supply Co., 106 Fla. 821, 145 So. 594, 597, in both of which it was said: “[Pjrivity with the owner, within the meaning of the lien statute, exists only when the creditor, in furnishing the materials or performing the labor, has acted on the owner’s obligation, express or implied, to pay therefor as a primary debtor.”
Under the former lien statute it was readily recognized that such a contract could be made by an owner through an agent. In Armstrong v. Blackadar, Fla.App.1960, 118 So.2d 854, 861, the court said: “Florida Statutes, § 84.11, F.S.A. does not preclude an owner of property from contracting through an agent for improvements to be made on his property so as to subject the property to a lien whether the agent is disclosed or undisclosed.” See also Waring v. Bass, 76 Fla. 583, 80 So. 514, 515; Chapman v. St. Stephens Protestant Episcopal Church, 105 Fla. 683, 136 So. 238, 138 So. 630, 139 So. 188, 145 So. 757. In 22 Fla.Jur., 1972 Supp., Mechanics’ Liens, § 22, it is said: “However, the Mechanics’ Lien Law does not preclude an owner of property from contracting through an agent, whether disclosed or undisclosed, for improvements to be made on his property so as to subject the property to a lien.”
Recognizing, as must be done under the law of agency, that an owner could become so obligated through an authorized agent, a material question in the trial court was whether, on the evidence which was before the court on the hearing on motion for summary judgment, there was presented a triable issue as to whether the architect was authorized to act for the owner in making a contract between the owner and the engineer for performance of services of the latter, leaving the compensation to be arranged for between the owner and the engineer.
In the judgment entered, the trial court necessarily held no such triable issue was presented. That conclusion was not justified on the record. There was substantial evidence of the existence of such agency, and a denial thereof by Pyms. There was an affidavit of the engineer,[2] and also his *359 deposition in which he related that when engaged by Wright he was told that Pyms was his employer and would pay for his services, but that he would be required to deal with Pyms as to the amount of his compensation. He referred to the services performed by him, and explained certain complexities of the project which he estimated was one that, as planned, would require an expenditure of approximately $250,000. He testified that during the time he was performing the services involved Pyms talked with him on occasions by telephone with reference thereto, and had written him a letter (which is in the record) containing certain directions regarding his services.
There was the deposition of the architect, Wright. The substance of his testimony was that prior to entering into his written contract with Pyms in September of 1969, which followed approval of Wright’s preliminary designs, he informed Pyms of the necessity for services of an engineer, and informed Pyms that he wanted to use the plaintiff Warshaw as engineer; that Pyms assented thereto, and agreed that the engineer would be paid by Pyms and not out of the fee to be paid to the architect; and that Pyms had agreed for Wright to engage the services of the plaintiff in that connection. Wright further testified that he proceeded to do so, by a telephone conversation, in the course of which he read to the engineer the contents of his written contract with Pyms, and told the engineer that Pyms was his employer and would pay his fee, but that the amount of his fee was to be arranged with Pyms.[3]
*360 Pyms’ deposition was not taken. The only denial or evidence in opposition to that testimony of the architect was Pyms’ affidavit in which he stated, as conclusions without supporting facts, that he had not directly or indirectly, employed or authorized the employment of the plaintiff or anyone else to perform the engineering-services.[4]
The deposition testimony of the architect, if not denied or contradicted, would appear sufficient to establish the authority of the architect to act for Pyms in the premises. If Pyms’ denial, in the form of a conclusion, was sufficient to create an issue thereon, it was error to enter summary judgment for the defendants, and the issue thus created was one for trial.
If the plaintiff was so employed, without his fee or fee basis fixed, he would be entitled to the value of the services performed. The fact that the engineer proceeded with the work without reaching an agreement with Pyms as to the price to be paid for his services, has no bearing on, and would constitute no impediment to the right of the engineer to a lien for the reasonable value of his services, to be determined on quantum meruit. The lien statute expressly so provides, where it states: “If no price is agreed upon by the contracting parties this term [contract price] shall mean the value of all labor, services or materials covered by the contract.” § 713.-01(3). By the contract with the architect he was to determine and direct the engineering services required to be performed.
The holding of the trial court that the defendants were entitled to summary judgment was incorrect, not only because of the presence of the triable issue relating to agency of the architect to employ the engineer for the owner, but for the further reason that the circumstances under which the engineer was employed and performed his services, as outlined in the deposition testimony of the architect and engineer (denied by the affidavit of Pyms), if established at trial, were such as could give rise to an implied contract between the owner and the engineer for payment by the former of the reasonable value of the services performed by the engineer, on authority of Harper Lumber and Mfg. Co. v. Teate, supra, and First National Bank of Tampa v. Southern Lumber & Supply Co., supra, and under Chapman v. St. Stephens Protestant Episcopal Church, supra, to operate to estop the defendants from disclaiming the agency of the architect and the contract made through him.
For the reasons assigned, the summary judgment entered in favor of the defendants is reversed, and the cause is remanded for further proceedings.

. “Any architect, landscape architect, engineer or land surveyor who has a direct contract and who in the practice of his profession shall perform services, by himself or others, in connection with a specific parcel of real property and subject to said compliances and limitations, shall have a lien upon such real property for the money owing to him for his professional services, regardless of whether such real property is actually improved.”

. The affidavit filed by the plaintiff engineer in support of his motion for jrar-tial summary judgment stated:
“3. In 1969, I was approached by Carson Bennett Wright, A.I.A. and requested to perform certain engineering services and make certain drawings for a proposed residence for defendants, Jack Pyms and Adrienne Pyms, his wife. I was advised by Mr. Wright that Jack Pyms had contracted to pay me directly for my services and that he, Carson Bennett IVright, was authorized by the Pyms to engage my services on their behalf.
“4. In accordance with this contract wherein defendant, Pyms, had agreed to pay directly for engineering services, I performed certain professional engineering services in connection with the real property described in paragraph 2 of the Complaint herein.
“5. Thereafter, I was furnished with a copy of the written contract, dated September 30, 1969, between the architect, Carson Bennett Wright, and the defendants, of which I was previously advised and upon which I relied as representing the obligation of Jack Pyms to pay for my services. A copy of said contract is annexed hereto and marked Exhibit ‘A’.
“6. During the course of the performance of my services, I had several telephone conversations with defendant, Jack Pyms, who was at all times aware of the fact that I was performing the engineering services. For example, on January 29, 1970, defendant, Jack Pyms, wrote me a letter pertaining to my services, a copy of which letter I annex hereto as Exhibit ‘B’.
“7. On March 9, 1970, I forwarded to defendant, Jack Pyms, my statement for services rendered, a copy of which statement is annexed hereto as Exhibit ‘C’.
“8. At no time did I have any contractual arrangement with the architect, Carson Bennett Wright, for the architect to pay me for my engineering services. To the contrary, it was always my understanding, as evidenced by Exhibit ‘A’ an *359 nexed hereto, tlmt my contract for payment was with the owner, defendants Pyms, and my services were rendered in reliance upon this contract.”

. Bearing on the question of the authority of the architect to act as agent of the owner in employing the engineer, was the following testimony in the deposition of the architect:
“Q Now, did you discuss the engineer who would be employed? A Yes, Sir. Q And what did you tell Mr. Pyms? A I told Mr. Pyms that my preference would be to use Mr. Warshaw, based on his abilities as an engineer and also the fact that ho had worked on The Ledges. Q When did this conversation take place? A. This was way back in our discussions before we actually started with the work. In fact, the contract was predicated on that discussion. Q And did you discuss any other engineer? A No, sir, I did not. Q Did you discuss who would undertake the job of securing the engineer? A Yes. I told him that I would call the engineer. He did not rebut in any way to the use of Mr. AVarshaw.
“Q (By Mr. Dubbin) Did he say go ahead and get an engineer? A He agreed to utilize Mr. Warshaw’s services.
* * * * *
“Q All right. What conversation took place at the time that you consummated your discussion of the engineer, to the best of your memory?
“Mr. Layne: Let me just suggest we ask who was present and where these conversations took place.
“Mr. Dubbin: Sure, I would like to know who was present.
“The Witness: Mr. Pyms and I were present at one discussion. Myron Jacobs in my office was present at another discussion. He was present while we were discussing the use of Mr. AArarshaw, the engineering set-up.
“Again, I told Mr. Pyms that it would be my recommendation to use Bert. I spelled out my opinions as far as his abilities were concerned. I also spelled out that he had worked with us and favorably, in my mind, on The Ledges. Mr. Pyms was familiar with the job. He agreed that Mr. Warshaw would be acceptable.
“At that particular point I contacted Mr. AVarshaw and related our conversation, told Mr. Warshaw that he would negotiate with Jack Pyms as far as the fees were concerned. I had no idea what fee structure was involved, how it was being handled, what negotiations went on. As far as my communication with Mr. Pyms, I told him that I was using Bert Warshaw. This was my discussion and he approved of it.
“Q (By Mr. Dubbin) When did that communication take place? A This was prior to the drafting of the September 30th agreement.
*360 “Q (By Mr. Dubbin) Did you voluntarily advise Mr. Warshaw that you had no interest in the fees or that the fees were between he and the owner? A I strictly related to Mr. Warshaw what my agreement was with Mr. Pyms. Q But you testified that you told Mr. Warshaw that the matter of fees and fee basis would be between him and Mr. Pyms? A Yes, that is the contention of that letter.”

. There was a deposition of Mrs. Pyms, in which it was revealed she knew little about the matter. However, she stated it was known that the plaintiff was performing services as an engineer, and she knew that he did not work for nothing. Her belated claim that Pyms did not act for her (as part owner) regarding the engineer was inconsistent in that he alone signed the contract with the architect, and in his dealings with the latter acted for her as well as for himself.